THEODORE J. LAPRES, complainant-appellant,

*v.*

SARAH H. DOUGHTY et al., defendants-respondents.

[Decided October 11th, 1917.]

On appeal from a decree of the court of chancery advised by Vice-Chancellor Leaming, who filed the following opinion:

Complainant is grantee of Frederick Hemsley of certain land at Atlantic City, and has filed a bill to quiet title thereto by reason of claims made by the several defendants that complainant's title to a portion of the land so purchased is subject and subservient to the operation of certain restrictive building covenants impressed thereon by Hemsley in behalf of defendants and which covenants defendants claim to be entitled to enforce. Defendants have answered, and by their answer assert the rights in the land suggested by the bill, and by way of counter-claim pray that a part of the land may be decreed "to be subject to the lien and encumbrances created by said covenants, restrictions and conditions."

The evidence discloses that on and prior to May 1st, 1897, Hemsley was the owner of a tract of land westerly of the improved part of Atlantic City which extended across the island from the thoroughfare on the northerly side thereof to the exterior line established by the riparian commissioners in the Atlantic ocean as its southerly boundary. On May 1st, 1897, a map of the land was filed by Hemsley in the county clerk's office of Atlantic county. On that map the land is delineated in streets and lots, and each lot is numbered. The part of the tract now in controversy is the territory embraced within the boundaries of two of the most southerly or oceanward lots delineated on the map; these lots are respectively numbered on the map lots 130 and 131, and together extend from Stenton Place to Iowa avenue.

The map discloses, as its most southerly object, the words "Atlantic Ocean." Adjacent to and northerly of these words a boardwalk is disclosed running easterly and westerly. About fifty feet northerly of the boardwalk there is delineated a waving line extending easterly and westerly across the map, which line is obviously designed to represent high-water mark. Coincident with this line and extending between Stenton Place and Iowa avenue—two streets running northerly and southerly on the map—there is delineated on the map a double line, which is shown by the evidence to represent a bulkhead which had been erected prior to the date the map was filed. No numbered lots are disclosed on the map oceanward of the high-water mark and bulkhead. Adjacent to the bulkhead and northerly thereof and extending from Stenton Place to Iowa avenue the map delineates an alley. Adjacent to that alley and northerly thereof are the two lots now in controversy. Lot 131 extends northerly from the alley along Stenton Place ninety feet; lot 130 is adjacent to and easterly of lot 131, and extends northerly from the alley ninety feet along Iowa avenue. The two lots together embrace all the territory between Stenton Place and Iowa avenue and extend northerly from the alley ninety feet. Northerly of these two lots are two lots of the same size which are respectively numbered on the map 122 and 123; these two lots in like manner together extend from Stenton Place to Iowa avenue. Pacific avenue

crosses the tract in an easterly and westerly direction four hundred and sixty feet northerly of the bulkhead shown on the map.

The evidence fully discloses that this map was filed by Hemsley in furtherance of a general improvement or development scheme which he had determined upon, which scheme included a plan to fasten on the several lots certain restrictions relating to their use. To that end and for that purpose Hemsley thereafter inserted in all conveyances made by him certain restrictive covenants touching the use of the lots, and all, or nearly all, of the lots have since been conveyed by him by conveyances containing these covenants, and up to this time these restrictive covenants appear to have been uniformly observed. It is to quiet the title of lots 130 and 131 against the claim that those lots are held by complainant subject to the restrictive covenants that the present bill has been filed.

The uniform covenants which have been inserted in all deeds are nine in number. The first covenant restricts the location of buildings to be erected on the several lots, but provides for buildings oceanward of Pacific avenue to be located a greater distance from the streets than for buildings landward of Pacific avenue. Touching lots lying oceanward of Pacific avenue the provision is:

"All lots lying on Pacific avenue or lots between Pacific avenue and the Ocean bulkhead now erected, or that may hereafter be erected, on said property, on any of which lots no part of any building shall at any time be erected within eighteen feet of the front property line of any street or avenue bounding said lot or lots, nor within eight feet of the side dividing lines of said lot or lots, nor within three feet of the rear dividing line; excepting, however, the porch or front veranda of said building, which may be erected not nearer than eight feet of the front property line of any street or avenue bounding said lot or lots, and bay windows may be added to sides and front of said building, but shall not extend more than two feet from the main body thereof."

The second and third covenants fix the minimum cost of any building to be erected on any lot and restrict foundations and the height of porches.

The fourth covenant forbids the erection of any building except private dwellings on any lot, and the fifth covenant excepts

from the operation of all the preceding covenants lots on Atlantic avenue and northward thereof.

The sixth, seventh and eighth covenants relate to nuisances and other undesirable uses of buildings which are forbidden in certain locations.

The ninth covenant, which in connection with the part of the first covenant above quoted occasions this controversy, is as follows:

"It is expressly agreed and covenanted that the Beach front as laid out on said filed map between the bulkhead now existing on said premises and the Atlantic ocean, or between any bulkhead that may hereafter be erected on said premises and the Atlantic ocean, shall remain free, clear and unencumbered from and by any restrictions contained in above agreement, the said Frederick Hemsley reserving to himself, his heirs and assigns, the use and enjoyment of said beach front free from all covenants and restrictions."

Then follows, as a part of the ninth covenant, statements that the restrictions and reservations are placed on the lots as a part of a general plan of the owner to enhance the value by beautifying and making more healthful the occupancy of the land, and that the restrictions are so created as a part consideration for the purchase of the lots and that each and every purchaser shall abide by the covenants and be entitled to enforce them against any person violating them and that they are made for the mutual benefit of all purchasers, and that the grantor, his heirs and assigns will insert in and make part of each and every deed of conveyance by him or them of his or their remaining restricted property like covenants, conditions and restrictions; and that the restrictions shall attach to and run with the land, they being assumed by the purchasers in part consideration of the purchase price, and that it shall be lawful for Hemsley or his heirs or assigns and for any owner of any lot to institute and prosecute any proceedings in law or in equity for damages of or injunctions against persons violating or threatening to violate any of the covenants or restrictions.

The evidence disclosed that prior to the time the map was filed a bulkhead had been erected at the place designated on the

map, and at the time the map was filed it had been partially destroyed by a storm.

Conveyances of lots were thereafter made by Hemsley by reference to the filed map, and in the year 1898 nearly all of the lots had been sold, but Hemsley then still owned not only lots 130 and 131, now in controversy, but also the two adjoining lots numbered 122 and 123. In that year (1898) a new bulkhead was erected by Hemsley extending from Stenton Place to Iowa avenue, on the line which separates lots 130 and 131 from lots 122 and 123. April 27th, 1909, a new map was filed by Hemsley, in Atlantic county clerk's office, on which map the new bulkhead was delineated, and no lots or alleys were shown oceanward thereof, the intervening space being left blank on the new map. October 25th, 1909, an ordinance was passed by the city council of Atlantic City vacating the alley shown on the first map as adjacent to, and landward of, the bulkhead shown on that map. November 6th, 1909, a deed of conveyance was executed by Hemsley to complainant herein for the land lying between the new bulkhead and the riparian commissioners' exterior line in the ocean. The deed from Hemsley to complainant contains the same covenants that all former deeds from Hemsley had contained.

Complainant now claims that by reason of the fact that the restrictions here in question are imposed only on the lots lying between Pacific avenue and the "ocean bulkhead now erected or that may hereafter be erected on said property," as contained in the first covenant, and by reason of the additional provision contained in the ninth covenant

"that the beach front as laid out on said filed map between the bulkhead now existing on said premises and the Atlantic ocean, or between any bulkhead that may be hereafter erected on said premises and the Atlantic ocean, shall remain free, clear and unencumbered from and by any restrictions contained in above agreement, the said Frederick Hemsley reserving to himself, his heirs and assigns, the use and enjoyment of said beach front free from all covenants and restrictions,"

lots 130 and 131, which now lie wholly outside or oceanward of the present bulkhead, are free from the operation of the restrictive covenants.

I am unable to adopt the view which has been suggested in behalf of defendants that the language contained in these covenants relating to a possible future bulkhead has reference alone to a future bulkhead located on the site of the old one or oceanward thereof. These covenants, to be accurately understood, must be not only considered in their entirety, but also in connection with their obvious purpose as disclosed by the circumstances surrounding their adoption; when so considered, I think their meaning, force and application clear and unmistakable. At the time these covenants were adopted the old bulkhead had been partially destroyed by the ocean, and the fact that there was then an apparent and well-known possible necessity of the removal of the bulkhead landward by reason of the future encroachment of the ocean must be accepted as a fact; in like manner it cannot be doubted that the possibility of the recession of the ocean was equally well known. Nor can the well-known office or purpose of bulkheads on the ocean front be disregarded; they are to afford protection from high tides and storms and mark the line to which the property landward is to be filled in and built upon with supposed safety. It will also be observed that these covenants provided that private dwellings only should be erected on lots between Pacific avenue and the bulkhead then existing or thereafter to be erected. The land oceanward of the bulkhead then existing or thereafter to be constructed is referred to in the ninth covenant as "beach front;" it is there declared that Hemsley reserves to himself the "said beach front free from all covenants and restrictions." The improvement enterprise thus clearly and unmistakably anticipated and depicted by the general plan as disclosed by the covenant in their entirety was a tract of land on which attractive residences only should be erected extending territorially from Pacific avenue to an "ocean bulkhead," and the land next oceanward of the bulkhead contemplated as "beach front" which should remain free from the restrictions. In such an enterprise, contemplating an improved residential section extending to an ocean bulkhead and an unrestricted beach front oceanward thereof, and general reference to a possible change of location of the bulkhead landward, could only be understood by purchasers of the lots as changes in location made

necessary for the preservation of the general improvement scheme as distinguished from changes of location not rendered necessary by the ocean's encroachment, but made at the caprice of Hemsley for the purpose of removing restrictions from lots otherwise restricted. A mental photograph of the general improvement scheme as depicted by a consideration of the covenants in their entirety is unchanged and wholly unaffected by a removal landward of the bulkhead when such removal is rendered necessary by the encroachment of the ocean, for the original map discloses building lots extending to a bulkhead located at a place which is delineated on the map as high-water mark and discloses an open beach front extending oceanward thereof. The spirit of the whole enterprise clearly contemplates a continuance of those conditions and renders it impossible for Hemsley to release the front lots from the restrictions by an arbitrary removal of the bulkhead location landward without an accompanying necessity for such removal.

The evidence discloses the existence of no such necessity, but, on the contrary, discloses that when the bulkhead location was changed by Hemsley the ocean had in fact receded. The testimony further discloses that the new bulkhead was erected in 1908; that the new map depicting the new bulkhead was filed in April, 1909; that the alley was vacated by ordinance passed in October, 1909, and the deed to complainant made in November, 1909. These sequential events, when considered in connection with the fact that the ocean had been gradually receding for many years prior, strongly suggest that the change of location of the bulkhead may have been for the defined purpose of relieving the lots from the restrictions; but whether for that purpose or not, the evidence clearly fails to disclose that the change of location was based on any necessity for such change having arisen, and must be regarded as arbitrary and not contemplated by the covenants.

I will advise a decree denying the relief prayed by the bill.

*Mr. Clarence L. Cole,* for the appellant.

*Messrs. Grey & Archer,* for the respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Leaming.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—14.

*For reversal*—None.